IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROSETTA SMITH, | ) |
|        Plaintiff, | ) |
| v. | )    2:24-cv-00476 |
| PHILLIPS & ASSOCIATES, INC., et al, | ) |
|        Defendants. | ) |

## <u>OPINION</u>

**Mark R. Hornak, Chief United States District Judge**

This case involves allegations of sex-based discrimination and retaliation. Plaintiff Rosetta Smith worked for Defendant Phillips & Associates,[1] a firm that contracts to provide security during employment disputes involving labor strikes. Smith alleges she experienced gender-based harassment and adverse employment action beginning in March 2023 while working for the Defendant at the *Pittsburgh Post-Gazette* strike site. The Plaintiff's two causes of action are sex discrimination and retaliation, each advanced under Title VII. Civil Rights Act of 1964 § 701 et seq., 42 U.S.C.A. § 2000e et seq. Now pending before the Court is the Defendant's Motion for Summary Judgment. (ECF No. 39). For the reasons discussed below, the Court will grant Defendant's Motion.

---

[1] The Plaintiff names two defendants: Phillips & Associates, Inc., and Phillips Associates. (*See, e.g.*, ECF No. 1, ¶ 5 ("Defendants were joint-employers of plaintiff at all times material hereto in that they used the names Phillips Associates, Inc. and Phillips & Associates, Inc. interchangeably")). For its part, though, Phillips & Associates, Inc., asserts that the plaintiff "improperly identified [it] as two separate entities." (ECF No. 10, at 1). The Court ordered the incorrect party "Phillips Associates" dismissed due to nonexistence on August 15, 2024. (ECF No. 24). The Plaintiff, however, continued to address filings to both original Defendants. (*See, e.g.*, ECF No. 43). To avoid confusion regarding the scope of the Court's Order as to the disposition of the pending summary judgment motion, the Order is addressed to both Defendants. The Court's Opinion, however, internally refers to the Defendant as one entity in accordance with Defendant's averment and the Court's prior Order.

1

I.      **Factual Background**

Phillips & Associates, Inc., ("Phillips" or "Defendant") is a corporation that provides various security and consulting services across the nation, often to employers involved in labor disputes. (ECF No. 41, ¶ 1). Phillips is based in Toccoa, Georgia. (ECF No. 1, ¶ 4). Among other services, the firm offers "Strike Response Teams," which are comprised of Project Managers and Site Commanders as well as Strike Agents, who "ensure picketers are orderly." (ECF No. 47, ¶ 3). Given the nature of labor disputes, Strike Response Teams must be assembled and dispatched quickly. (ECF No. 41, ¶ 3). Phillips employees generally must travel to where the strike is taking place, so Project Managers make travel and housing arrangements. (*Id.* ¶¶ 4, 7). For instance, Plaintiff Rosetta Smith ("Smith" or "Plaintiff") lived in Union Springs, Alabama, but was twice staffed on the *Pittsburgh Post-Gazette* strike location in Western Pennsylvania. (ECF No. 1, ¶ 2).

Strike Agents get assigned 45-day rotations at strike locations. (ECF No. 41, ¶ 13). Agents are not required to accept assignments offered, but if they do accept, they must agree to work a consecutive 45-day period. (*Id.* ¶¶ 11–13). Because each employee shares a hotel room with an employee of the same gender, Phillips tries to maintain an even number of employees of each gender to reduce lodging costs. (*Id.* ¶ 17).

One matter preliminary matter involved in resolving the pending Motion is how assignments are offered to and received by Agents. The Defendant asserts that Phillips "begins to assemble the [Strike Response] [T]eam by first sending out an email to request the employees' availability for the assignment." (*Id.* ¶ 4). The Plaintiff denies that assignments ever occur via email, averring that "[t]he [T]eam is initially put together by making phone calls from a call roster" and that emails are only sent to ascertain Site Commanders' availability, not Strike Agents' availability. (ECF No. 43-1, ¶ 4). But this is not a genuine dispute. It is plain from the documentary

record that supervisors do send emails to Strike Agents, including emails that were sent to the Plaintiff, to determine availability for assignments. (*See, e.g.*, ECF No. 42-28 ("We have several projects coming up between the 23rd and the 31st [of July 2023]. If you are available respond to this email"); ECF No. 42-32 (informing Strike Agents via email about a "big project pending next week" but directing Agents interested in being staffed on the assignment to email or text rather than call with their availability)). Indeed, the Plaintiff herself has even used email to inquire about assignments. (*See* ECF No. 42-8 (featuring an email from Smith to a Phillips supervisor informing the supervisor that Smith was available for upcoming assignments, dated November 20, 2020)).

Smith began working for Phillips as a Strike Agent in or around August 2015 after being recruited via phone. (ECF No. 47, ¶ 4). Based on the record, Smith's employment with Phillips proceeded without incident until March 2023. Smith was offered an assignment at the *Pittsburgh Post-Gazette* strike by Site Commander Daniel Roberts in October 2022. (ECF No. 41, ¶¶ 27–28). Her first rotation at the *Pittsburgh Post-Gazette* strike lasted 107 days, beginning on October 14, 2022, and ending on January 29, 2023. (*Id.* ¶ 29). Smith returned for a second rotation at the *Pittsburgh Post-Gazette* strike on March 11, 2023, which lasted 92 days. (*Id.* ¶¶ 31, 37). During that second rotation, there were between four and six female employees on the Strike Response Team. (*Id.* ¶¶ 35–36).

On or about March 13, 2023, the Plaintiff and fellow Strike Agent Isaac Carswell got into a verbal dispute.[2] (ECF No. 1, ¶ 12). Plaintiff alleges that after the exchange between them,

---

[2] The Defendant refers to this episode as a "confrontation." (ECF No. 41 ¶ 38). Plaintiff denies that this was a "confrontation." (ECF No. 43-1, ¶ 38 ("To the contrary, there was no confrontation. Plaintiff merely reminded Carswell to follow company procedure and not interact with picketers and Carswell responded in an outrageous manner.")). The Plaintiff prefers to say that "Mr. Carswell 'got mad' at Rosetta for telling him he was wrong to fraternize with picketers." (ECF No. 43-2, ¶ 35). From the Court's vantage point, debating the categorization of the episode as a "confrontation" or Carswell "getting mad" is a waste of time. The parties do not dispute that the exchange happened and that it was vigorous in tone. And as will be seen, it is undisputed that Carswell's conduct ultimately led to his dismissal by Phillips. (ECF No. 47, ¶ 35).

3

Carswell placed a phone call to another Strike Agent and told him, on the phone, to "come get this bitch [because] she [was] trying to tell [him] how to do [his] mother fucking job." (ECF No. 43-2 ¶ 35). Plaintiff reported Carswell's conduct to Phillips supervisors William Hatfield (Day Shift Supervisor), Randy Eason (Night Shift Supervisor), and James Beverly (Site Commander that day). (ECF No. 1, ¶ 13). Smith's Complaint in this action asserts that none of the supervisors took any action after her first such complaint. (*Id.*). But, in her Response to Defendants' Statement of Undisputed Facts, (ECF No. 43-1), Smith did not dispute that when Site Commander Roberts took charge several days later, he "took steps to ensure that Plaintiff and Carswell would not need to interact with each other and told Carswell to keep his distance from Plaintiff and not talk to her at all," (ECF No. 41, ¶ 43; ECF No. 43-1 ("[Paragraphs] 41–44 [of Defendant's Concise Statement of Material Fact, ECF No. 41]: Admitted.")).

Other important facts about what ensued between the Plaintiff, Carswell, and Phillips management are similarly undisputed. Smith does not dispute that "[o]n March 22, 2023, Shift Leader Randy Eason again counseled Carswell and reminded him to leave Plaintiff alone," (ECF No. 41, ¶ 44; ECF No. 43-1, ¶¶ 41–44 ("Admitted")). Following another incident involving Carswell, on March 23 Smith reported Carswell's conduct again. (ECF No. 43-2, ¶¶ 51, 53–54). But she does not dispute that, after she reported Carswell for the second time, "Site Commander Roberts . . . warned Carswell that this interaction was 'strike two' and to stay away from Plaintiff." (ECF No. 41, ¶ 47; ECF No. 43-1, ¶¶ 46–50 ("Admitted")). Smith further admits that she "did not have any further interaction with Carswell" after March 23, 2023. (ECF No. 41, ¶ 48; ECF No. 43-1, ¶¶ 46–50 ("Admitted")). Then, the straw that broke the camel's back was that Carswell was found smoking in a rental car. (ECF No. 43-2, ¶ 58). The Plaintiff admits that

> "Roberts sent Carswell home on April 8, 2023, [because] Roberts was fed up with Carswell's conduct on the job site; he heard from other Strike Agents that he was still

4

> talking about Plaintiff after Roberts directed him to leave her alone, so, as Roberts testified, 'that was it' . . . '[Y]ou gotta go. You're causing too much conflict out here, you gotta go." Appx Exh. 3, Roberts Dep. 33:1-13.

(ECF No. 41, ¶¶ 49–50; ECF No. 43-1, ¶¶ 46–50 ("Admitted.")).

Despite having admitted that Carswell was sent home due to his overall "conduct on the jobsite," (*id.*), the Plaintiff in the next breath claims that "Mr. Carswell [w]as [r]emoved from the Post-Gazette [s]ite for [o]ther [r]easons" than his harassment of Smith, (ECF No. 43-2, at 11). But even the record generated by Smith says something different. The admitted record facts are that Carswell was dismissed because he had "three strikes" and there is no dispute that the first two involved his actions toward Smith. Carswell's dismissal was not disconnected from Smith and her complaints about his conduct; those complaints were part and parcel of Phillips' action in removing Carswell from the workplace.

When Smith approached her supervisors to inform them that "by not sending Carswell home sooner[,] . . . Mr. Beverly and Mr. Hatfield placed her in a hostile environment for an unnecessary time period," she alleges that Beverly responded, "Well that is how the ball bounces sometimes — females were not always allowed in this industry." (ECF No. 43-2, ¶¶ 62–63). Phillips disputes that Beverly made that statement but contends that it is immaterial because Phillips has not brought a claim for a hostile work environment. (ECF No. 47, ¶ 63). And Smith had kept working as she ended her second rotation at the *Pittsburgh Post-Gazette* strike on June 11, 2023, more than 40 days after Carswell had left the site. (ECF No. 43-2, ¶ 89).

Smith contends that before she left the strike site on June 11, 2023, she had a conversation with Beverly in which she tried to persuade him to let her come back to the Pittsburgh site earlier than the proposed tentative return date of July 30, 2023. (*Id.* ¶¶ 75, 80). During that conversation, Beverly allegedly made a comment seemingly praising himself for bringing in diverse employees:

5

"Some people think I'm going to bring in all my White friends, but you see what I did last week — I didn't bring my friends in — I brought in two Blacks and a Hispanic." (*Id.* ¶ 82). Plaintiff suggests that this comment shows evidence of animus and retaliatory intent. (*See, e.g.*, ECF No. 43, at 20 ("This statement showed that, although [Beverly] recognized Rosetta's suggestion as a complaint of gender discrimination, he showed *animus* through his indifference to the rights of female Strike Agents.")). The Court will not try to divine Beverly's subjective intent in this statement. One thing is clear: the comment while oddly self-congratulatory, does not bear on the present dispute, one involving claims of gender discrimination and retaliation, not issues of race or national origin.

The parties argue about whether Plaintiff was "guaranteed" a third rotation at the *Pittsburgh Post-Gazette* strike. Phillips avers that even if supervisors suggest that a Strike Agent will return, it is not guaranteed. According to Phillips, "Plaintiff admits that Phillips could not 'guarantee' an assignment, even if she discussed one with a supervisor." (ECF No. 41, ¶ 21). In contrast, Smith asserts "that she was guaranteed an assignment so long as work was available, and work was available at all times material to this matter." (ECF No. 43-1, ¶ 21). The resulting picture from these positions seems pretty clear to the Court: Smith, at least for a period of time, operated under the assumption that she would return to the Pittsburgh site for a third rotation around July 30, 2023. (See ECF No. 43-2, ¶ 76). But there is more to this issue in the record. The "guarantee" of Smith returning for a third rotation to Pittsburgh was not put in writing, (ECF No. 43-5, at 29), and Smith was aware of the fact that future assignments could not be guaranteed because there was always the possibility that the strike would end and there would be no work, (ECF No. 41, ¶ 21 (quoting Plaintiff's deposition, Q: "So when Mr. Beverly told you on June 10 that you would

6

be going back on July 30, there was no guarantee that that would occur; correct?" A: "Correct. Only if there was no work." (Appx. Exh. 2, Plaintiff Dep. 110:15-18))).

Smith did not ultimately return to the Pittsburgh strike site for a third rotation, which is the genesis of this litigation. According to Smith, instead of calling her back to the Pittsburgh strike site, Beverly "replaced the two women with two men" during the week of July 30, 2023, "which was contrary to his expressed intention to always replace women with women." (ECF No. 43-2, ¶ 91). The parties agree that Beverly never contacted Smith about any openings at the Pittsburgh strike after June 10, 2023. (*Id.* ¶ 94; ECF No. 47, ¶ 94 ("Admitted")). Smith attempted to call Beverly once, on July 28, 2023, but did not get through, and she did not leave a message. (ECF No. 43-2, ¶ 109; ECF No. 41, ¶ 60). She did not try to call anyone else at Phillips, nor did she try to call Beverly more than once, nor did she email or text anyone at Phillips about the Pittsburgh assignment. (*Id.* ¶ 59). Importantly, from July through December 2023, Phillips continued to email Smith about more job opportunities with Phillips. (ECF No. 41, ¶¶ 64–70). Smith responded to none of the assignment emails. (*Id.*). Without any further attempts to get in touch with Phillips, and while Phillips was still continually emailing her potential work assignments, Smith claims without explanation that she "knew that she had been terminated." (ECF No. 43-2, ¶ 116).

At all times throughout the incidents that gave rise to this case and the subsequent litigation, Phillips has maintained employment policies prohibiting all forms of unlawful discrimination and harassment, and employees are encouraged to report incidents of discrimination or harassment to their supervisor or higher management. (ECF No. 41, ¶¶ 22–23).

## II.     Procedural Posture

Smith filed her Complaint in this Court against Phillips on March 29, 2024. (ECF No. 1). Instead of filing a Motion to Dismiss, Phillips filed an Answer to Smith's Complaint on June 18, 2024. (ECF No. 10). Pursuant to Local Civil Rule of Court 16.2, the case was referred to Early Neutral Evaluation ("ENE"), a form of alternative dispute resolution. (ECF Nos. 11, 19). The case was not resolved through ENE, (ECF No. 32), so discovery was extended, (ECF No. 34). Phillips filed a Motion for Summary Judgment on May 16, 2025, which is now before the Court. (ECF No. 39).

As stated above, the Plaintiff's stated causes of action in her Complaint are for sex-based discrimination and retaliation under Title VII. In her Complaint, both of those claims focus on her alleged *termination* from employment at Phillips. (*See, e.g.*, ECF No. 1, ¶ 38 ("Thus, plaintiff was terminated from employment by defendants with her last day of employment being June 11, 2023.")). The language in the section of her Complaint specifically about Plaintiff's causes of action primarily concerns her alleged termination. Under "Count I—Gender Discrimination by Defendants," Smith states the following:

- "Plaintiff contends that she was *terminated* by Mr. Beverly based upon her female gender," (*id.* ¶ 45);
- "Mr. Beverly clearly did not like plaintiff's complaints of gender discrimination, did not wish to schedule her ahead of a male employee, and did not agree that she deserved to be a shift lead," (*id.* ¶ 47);
- "Mr. Beverly thereafter made sure that plaintiff was *terminated* by cutting off all contact with her," (*id.* ¶ 48);
- "By and through its conduct, defendants, either individually, severally or jointly, violated Title VII by intentionally discriminating against plaintiff and *terminating* her employment based on upon her female gender," (*id.* ¶ 53) (all emphases added).

Similarly, under "Count II—Retaliation by Defendants," Smith states the following:

- "Plaintiff contends that she was *terminated* by Mr. Beverly based upon her good faith complaints of gender discrimination," (*id.* ¶ 55);

- "Mr. Beverly thereafter made sure that plaintiff was *terminated* by cutting off all contact with her," (*id.* ¶ 57);
- "By and through its conduct, defendants, either individually, severally or jointly, violated Title VII by intentionally retaliating against plaintiff and *terminating* her employment because she made several good faith complaints of gender discrimination," (*id.* ¶ 62) (all emphases added).

But apparently confronted with undisputed evidence that Phillips was rather persistent in attempting to engage her at other worksites, Plaintiff pivoted after Defendant's Brief Supporting Motion for Summary Judgment presented that unrefuted record evidence that Phillips did not, in fact, terminate Smith's employment. (ECF No. 40). Phillips presented unrebutted evidence that it continued to solicit work from Smith via email well after June 11, 2023, and that Smith simply never responded to its emails. (*See, e.g.*, *id.*, at 5–6 ("Beverly emailed Plaintiff personally on June 21, 2023, to seek her availability for a nurses' strike"; "Beverly emailed Plaintiff and other Strike Agents again on July 17, 2023"; "[Plaintiff] was offered at least three more assignments in September 2023, October 2023, and December 2023—but she never responded to any of the emails")).

Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment thus endeavored to change a fundamental element of her claims against Phillips. (ECF No. 43). The Plaintiff stated that even though "the Complaint sets forth that Rosetta claims that she was 'terminated' . . . Plaintiff Rosetta Smith limits her claim to the denial of her promised third rotation." (ECF No. 43, at 1). From that point forward in her argument, instead of the operative conduct that formed the basis of Smith's claim being Phillips's termination of Smith (the alleged harm which pervades her Complaint in this Court), the operative conduct Smith complains of morphed into Smith not getting called back to the *Pittsburgh Post-Gazette* strike site for a third rotation in or around August 2023.

Phillips was taken aback by the Plaintiff's change of tune as to her legal claims. It argues in its Reply Brief that Smith could not assert a new claim based on the denial of the third Pittsburgh rotation because Smith had asserted a different claim in her Complaint — she had asserted a claim based on alleged termination. (ECF No. 46, at 2 ("Courts consistently reject attempts to defeat summary judgment by plaintiffs asserting new claims or theories not pled in the complaint.")). Smith filed a Sur-Reply (ECF No. 54), in which she argued that her claim about her lack of a third rotation really *was* in her original Complaint:

> The claims and/or theories set forth in Rosetta's complaint are gender discrimination and retaliation claims pursuant to Title VII. These claims were never changed. Instead, the scope of the claims were limited. Rosetta had always claimed that she was terminated when she was denied return to the Post Gazette site as promised on July 30, 2023. Rosetta contends that she committed to return to work on July 30, 2023 — as she was promised. But, when that promise was broken, Rosetta suffered damages thereafter. Rosetta's damages always commenced as of July 30, 2023.

(*Id.* at 3–4). That procedural history takes us up to the present and undergirds this Opinion.

### III.     Legal Standard

Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment for the movant — here, Defendant Phillips — if the movant demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material "only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). To prevent summary judgment, the non-movant — here, Plaintiff Rosetta Smith — must present evidence that creates a genuine dispute of material fact with respect to every essential element of the cause of action. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).

10

In deciding whether to grant summary judgment, the Court does not weigh the evidence or make credibility determinations. *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Rather, the Court must view the evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If there is a conflict between the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the plaintiff cannot "rest upon the mere allegations or denials of his pleadings" at the summary judgment stage. *Nitkin v. Main Line Health*, 67 F. 4th 565, 571 (3d Cir. 2023) (citation omitted). A plaintiff's failure to make a sufficient showing on even one necessary element of a claim "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

It is axiomatic that plaintiffs are not permitted to change the fundamental nature of their claim for relief in a response brief at the Summary Judgment stage. Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Our Court of Appeals has held that plaintiffs must use Rule 15 if they wish to introduce a new claim or theory at the summary judgment stage.[3] *See Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." (quotations omitted)).

---

[3] Courts are directed to "freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts are not required, however, to grant leave to amend a complaint in the face of a summary judgment motion that came after the discovery process concluded. *See, e.g.*, *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir. 1993) ("The district court found that amendment of Josey's pleadings after the close of discovery would prejudice the defendant. [The Court of Appeals] will not weaken the district court's control over its own docket by requiring a relaxation of pleading requirements.").

### IV. Discussion

The Court first assesses whether Smith's revised claim based on the denial of a third rotation at the *Pittsburgh Post-Gazette* strike is cognizable based on the claims asserted in the Complaint. Although the Court determines the revised claim is *not* cognizable because it was *not* properly asserted in the Complaint, the Court includes a discussion of the Plaintiff's sex discrimination and retaliation claims as she now argues them for the sake of completeness.

A. *Plaintiff's Claim*

As an initial matter, the Court must determine whether Plaintiff's claim regarding her alleged denial of a third rotation at the Pittsburgh strike location was sufficiently incorporated into her Complaint to overcome the requirement mandating amendment only through a timely Rule 15(a) motion. The key inquiry here is whether Phillips would have been put on notice that Smith was alleging that the denial of the third rotation in Pittsburgh constituted an adverse employment action premised on unlawful sex discrimination and that the case really was not about a job termination. Smith contends that this is simply a question of the *scope* of the claim. (*See, e.g.*, ECF No. 43, at 1). Phillips counters that this is not simply a question of scope, as the two claims are fundamentally different: the Complaint's asserted claim is about the termination of her employment (which the record plainly demonstrates never occurred), whereas the Brief's claim is about the allegedly adverse employment action of not getting the third rotation. (*See, e.g.*, ECF No. 46, at 2).

Other courts in this Circuit have looked at the language of complaints and the content of the alleged violations to determine the scope of claims at the summary judgment stage. *Summy-Long v. Pennsylvania State University*, 226 F. Supp. 3d 371, 389 (M.D. Pa. 2016), *aff'd*, 715 F. App'x 179 (3d Cir. 2017). In *Rudolf v. American International Group*, this Court determined that

because two fraud-related allegations had not constituted "the basis for [plaintiff's] claim as set forth in Count XII of the Amended Complaint," the plaintiff could not "now rely on them to defeat summary judgment." No. CV 19-1468, 2023 WL 2587388, at *21 (W.D. Pa. Mar. 21, 2023). Another court in this Circuit has held that tangentially related claims asserted in a brief opposing summary judgment that were not included in the operative complaint were not cognizable. *Archie v. City of Philadelphia*, No. CV 22-2915, 2025 WL 220024, at *9 n.13 (E.D. Pa. Jan. 16, 2025) (determining that "retaliatory denial of overtime and retaliatory harassment in the form of mistreatment from peers" as asserted in a brief opposing summary judgment could not be considered part of plaintiff's claims because they were not included in plaintiff's operative complaint, which was based on the adverse employment actions of demotion, transfer, removal of responsibilities, assignment to the worst vehicles, and retaliatory harassment based in part on assignment to the worst vehicles).

In the present case, the Complaint mentions that Smith was denied a third rotation in Pittsburgh in its recitation of alleged facts:

> On July 28, 2023, plaintiff called for flight information for travel to attend her third rotation which she was told by Mr. Beverly would start on July 30, 2023, but she received no response. . . . Plaintiff never heard from defendants again. Thus plaintiff was terminated from employment by defendants with her last day of employment being June 11, 2023.

(ECF No. 1, ¶¶ 32, 37–38). But solely mentioning an event or allegation in the complaint does not necessarily suffice for putting the defendant on notice that it is the gravamen of the claim for relief. In *Summy-Long*, there was at least one "substantive paragraph" in the plaintiff's complaint that was devoted to the legal theory that was then asserted in full force at summary judgment stage. 226 F. Supp. 3d at 390. No matter, the court said — the plaintiff still could not assert it because "no averment [was] devoted" to the theory to put the defendant on notice at the pleading stage.

13

Similarly, in this case, "the sole focus" of Smith's Complaint is her claim of wrongful termination — not the denial of the third rotation. *Id.*

The plaintiff bears the responsibility for asserting all claims for relief in the operative complaint. The sections laying out the causes of action in Smith's Complaint do not mention the denial of the rotation. As stated above, in "Count I—Gender Discrimination by Defendants," Smith states:

- "Plaintiff contends that she was *terminated* by Mr. Beverly based upon her female gender," (ECF No. 1, ¶ 45);
- "Mr. Beverly clearly did not like plaintiff's complaints of gender discrimination, did not wish to schedule her ahead of a male employee, and did not agree that she deserved to be a shift lead," (*id.* ¶ 47);
- "Mr. Beverly thereafter made sure that plaintiff was *terminated* by cutting off all contact with her," (*id.* ¶ 48);
- "By and through its conduct, defendants, either individually, severally or jointly, violated Title VII by intentionally discriminating against plaintiff and *terminating* her employment based on upon her female gender," (*id.* ¶ 53) (all emphases added).

In "Count II—Retaliation by Defendants," Smith states:

- "Plaintiff contends that she was *terminated* by Mr. Beverly based upon her good faith complaints of gender discrimination," (*id.* ¶ 55);
- "Mr. Beverly thereafter made sure that plaintiff was *terminated* by cutting off all contact with her," (*id.* ¶ 57);
- "By and through its conduct, defendants, either individually, severally or jointly, violated Title VII by intentionally retaliating against plaintiff and *terminating* her employment because she made several good faith complaints of gender discrimination," (*id.* ¶ 62) (all emphases added).

A reasonable defendant interpreting Smith's Complaint would have understood that the Plaintiff's accusation arose exclusively from her allegedly unlawful termination of employment.

The Plaintiff contends that any alleged revision of her claim at this stage is simply a question of scope because "the primary event leading to Rosetta's claims was when her Site Commander James Beverly reneged upon his promise to bring her back for a third rotation . . . . because she is a woman and/or because she made multiple good faith complaints of gender

14

discrimination." (ECF No. 43, at 1–2). But an essential element of both of Smith's causes of action — sex discrimination and retaliation — is the employer's conduct leading to those claims. Changing the claim regarding the employer's conduct is not simply a question of "scope."

Beyond all of that, for a sex discrimination claim, the Plaintiff must demonstrate that she suffered an adverse employment decision. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008). For a retaliation claim, the Plaintiff must similarly demonstrate that an adverse action was taken by the employer either after or simultaneous with the plaintiff's protected activity. *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015). A defendant is entitled to know, from the beginning of the litigation, what conduct forms the basis of the adverse employment decision allegedly based on unlawful discrimination and retaliation. In the Complaint here, the answer to that question is Smith's alleged job termination. But the Plaintiff's proposed position became quite different by the summary judgment stage: the conduct in question is instead the denial of the third rotation in Pittsburgh. Because this affects key elements of the causes of action, it is impermissible to assert that new position for the first time in a brief opposing summary judgment.

The Court concludes that Plaintiff's claims based on denial of the third rotation is beyond the scope of the Complaint and therefore non-cognizable in these proceedings.

B. *Sex-Based Discrimination (Count I)*

Beyond the matters set out above, plainly put, the Plaintiff cannot and does not establish a prima facie sex discrimination claim based on the denial of a third rotation at the Pittsburgh strike. To establish a prima facie case of gender discrimination, Plaintiff must demonstrate (1) she was a member of a protected class; (2) she was qualified for the job position; (3) she suffered an adverse employment decision; and (4) there is a causal nexus between her gender and the adverse

15

employment action. *C.A.R.S. Prot. Plus*, 527 F.3d at 364–65. "If the employee is able to present [a prima facie] case, then the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. If the employer is able to do so, the burden shifts back to the employee, who, to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination." *Id.* at 364.

At this point, the parties do not dispute that Smith was, in fact, sent multiple emails offering her work with Phillips after the date that she initially alleged in her Complaint that she was terminated. (ECF No. 40, at 5–6 ("Beverly emailed Plaintiff personally on June 21, 2023, to seek her availability for a nurses' strike"; "Beverly emailed Plaintiff and other Strike Agents again on July 17, 2023"; "[Plaintiff] was offered at least three more assignments in September 2023, October 2023, and December 2023—but she never responded to any of the emails")). The record is plain that the Plaintiff was offered multiple opportunities to keep working for Phillips and in the same manner that Phillips had made those types of offers in the past, including to Plaintiff. Simply put, there is no genuine dispute that the Plaintiff's employment was not terminated by Phillips.

Smith now contends that the *Post-Gazette* strike assignment was promised to her, and the Court can infer that it was preferred by her. Thus by not getting the third rotation, Smith allegedly suffered an adverse employment action. What constitutes an "adverse employment" action for purposes of Title VII's anti-discrimination provision is not a heavy lift, but it is not weightless. *Betts v. Summit Oaks Hosp.*, 687 Fed. App'x. 206, 207 (3d Cir. 2017) (defining an adverse employment action for purposes of a discrimination claim as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998))); *see also Cavanaugh v. Wal-Mart Stores E., LP.*, 733

16

F. Supp. 3d 362, 369 (M.D. Pa. 2024), *appeal dismissed sub nom. Cavanaugh v. WalMart Stores E. LP*, No. 24-2077, 2024 WL 5055841 (3d Cir. Oct. 22, 2024) (rejecting a claim that the denial of a lateral transfer constituted an adverse employment action). Here, Smith has not advanced any evidence showing that the lack of that third Pittsburgh rotation resulted in a significant change in her employment status or was somehow adverse to her.

Title VII does not generate a right to select future work assignments. The Supreme Court has held that forced job transfers can constitute adverse employment actions, but only if the plaintiff shows "that the transfer brought about some disadvantageous change in an employment term or condition." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024). The Plaintiff has done nothing to demonstrate that not coming back to the *Pittsburgh Post-Gazette* job for a third rotation was adverse to her in any fashion. She shows how much she was paid on the first two rotations in Pittsburgh, (ECF No. 43-26), but does nothing to show that the jobs she was offered would have paid her less or were somehow otherwise adverse to her interests. In fact, the record suggests that the assignment she was offered on June 21, 2023, after she was allegedly terminated from employment, was considered "high profile" and therefore a valuable stepping stone to more and better assignments within Phillips. (ECF No. 41, ¶ 54). And geography is not an issue, since Smith lives in Alabama, and whether she was traveling to work in Pittsburgh or somewhere else means that she was still traveling, so this reality does not alter that part of the equation.

Federal Courts are not in the business of mandating corporate assignments or daily staffing practices. *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 527 (3d Cir. 1992) (noting that "barring discrimination, a company has the right to make business judgments on employee status" and that without evidence casting doubt on an employer's articulated reasons for an employment decision, courts "will not interfere in an otherwise valid management decision"

17

(citation omitted)). Smith asserts that it shows animus that Beverly did not replace the female Strike Agents on the Pittsburgh strike site with other female Strike Agents because this was "a move that was contrary to his usual practice as well as company practice of replacing women with women." (ECF No. 43-2, ¶ 121). But without record evidence of unlawful disparate treatment of the Plaintiff herself resulting from the asserted policy change, deviating from an internal staffing procedure while still affording work opportunities both to her and to other employees does not make out a discrimination claim cognizable under Title VII.

The fundamental element of an adverse employment action is missing here, which defeats Smith's prima facie claim of sex discrimination, and prevents her claim from moving forward.

C. *Retaliation (Count II)*

Similarly, Smith has no valid claim for retaliation. A prima facie retaliation claim is established by facts showing (1) that the plaintiff engaged in protected activity; (2) that an adverse action was taken by the employer either after or contemporaneous with the plaintiff's protected activity; and (3) a causal connection between the plaintiff's protected activity and the employer's adverse action. *Daniels*, 776 F.3d at 193.

There can be no "retaliation" without an adverse employment decision. The definition of an "adverse employment action" for purposes of Title VII's prohibition on retaliation is slightly different than its definition for purposes of Title VII's prohibition on unlawful discrimination. "[A] plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions materially adverse in that they well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore v. City of Phila.*, 461 F.3d 331, 341 (3d Cir. 2006), *as amended* (Sept. 13, 2006). The allegedly adverse action is assessed by the court "from the perspective of a reasonable person in the plaintiff's position," not

from that particular plaintiff's subjective position. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 195 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 71 (2006)).

The alleged action here — that Smith did not get staffed on the Pittsburgh strike for a third rotation — does not meet the anti-retaliation provision's definition of adverse action, either. There is no proffered reason why working on the Pittsburgh strike would have been objectively preferable compared to the other jobs Smith was offered, or more precisely, why having a number of other employment opportunities in its stead would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Moore*, 461 F.3d at 341. Smith continued to be offered work by Phillips but did not respond to or accept any such offers. She has not advanced a record basis, beyond the inference that she preferred an assignment in Pittsburgh, why those offers were "adverse" to her. The Plaintiff's claim for retaliation similarly fails because it does not show that Smith suffered an adverse employment action.

### V.     Conclusion

For the reasons set out above, the Defendant's Motion for Summary Judgment is GRANTED.

An appropriate Order will issue.

    s/ Mark R. Hornak
    Mark R. Hornak
    Chief United States District Judge

Dated: September 25, 2025

cc: All counsel of record